Patrick McCAWLEY, Plaintiff,

v.

UNIVERSIDAD CARLOS ALBIZU (Carlos Albizu University), Inc., Defendant.

No. 04–23159–CIV–KLEIN.

United States District Court, S.D. Florida, Miami Division.

April 18, 2006.

Robert Franklin Rosenwald, Jr., Hennessey Law Firm, Randall Lawrence Gilbert, Miami, FL, for Plaintiff.

Jorge A. Lopez, Susan Nadler Eisenberg, Akerman Senterfitt, Miami, FL, for Defendant.

*ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

KLEIN, United States Magistrate Judge.

THIS CAUSE is before the Court upon Defendant's Motion for Summary Judgment and Memorandum of Law in Support thereof (D.E.Nos.35, 36); Defendant's Concise Statement of Undisputed Material Facts Filed in Support thereof (D.E. No. 37); Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (D.E. No. 43); Plaintiff's Notice of Filing Affidavit in Opposition to summary judgment (D.E. No. 45); and Defendant's Reply thereto (D.E. No. 48). After considering the motion, reviewing the file, and being otherwise advised, the Court GRANTS Defendant's motion for sum-

mary judgment, for the reasons set forth below.

This is an action in which Plaintiff, Patrick McCawley ("McCawley"), is suing Universidad Carlos Albizu, Inc., a private university ("University"), claiming that despite his completion of all academic requirements needed for conferring his degree, the University arbitrarily and capriciously refused to confer a doctorate in psychology, in violation of his contract with the University. The University, which refused to confer the degree and dismissed McCawley from the program, based its decision not on McCawley's failure to complete the academic requirements, but on his failure to abide by other contractual undertakings by him, consisting of a long history of violations of rules of professional conduct, institutional norms and acceptable standards of ethical behavior.

## I. BACKGROUND

### A. McCawley's Disciplinary Record

McCawley was a psychology doctoral student at the University from 1997 through 2004. His academic record was good, and is not in dispute. However, during the period that he was a student, McCawley engaged in conduct which brought him before the University's Quality Assurance Committee ("QAC") on four separate occasions.[1]

The first QAC was convened in 1997, and unanimously found that McCawley has been absent from his clinical placement center and had been scheduling repeated appointments with clients who were no longer seeking treatment in the program.

McCawley was placed on probation as a result of these findings. McCawley did not appeal the findings or conclusions despite his clear right to do so. Approximately two years later, a second QAC was convened and unanimously concluded that McCawley had committed egregious plagiarism on a dissertation concept paper he submitted to the University. The QAC recommended that McCawley be dismissed from the University, a recommendation approved through all appeals, but the Board of Trustees reduced McCawley's sanctions from termination to a one year suspension.

In September 2003, the University discovered that McCawley had been arrested on two prior occasions, and failed to disclose either of the two arrests to the University as required by the University Catalog's policies and procedures. Moreover, the arrest affidavits signed by McCawley listed his employment as "psychologist" and "neuropsych. consult." As a result, the Chancellor suspended McCawley and convened a third QAC. The third QAC found that McCawley's failure to notify the University of his arrests violated the University's policy, and the suspension should be upheld. These findings were upheld on appeal. The University later learned that McCawley was arrested on two additional occasions during his enrollment and never reported these arrests to the University.

In March 2004, the University acquired information that McCawley, despite not having been conferred his degree, was representing himself as a Doctor in Psychology (Psy.D.) to patients and other members of the public. McCawley maintained and distributed two different business cards, one identifying him as "Patrick McCawley,

---

**1.** A Quality Assurance Committee is convened by the Director of Student Affairs as part of the University's policies. There are specific enumerated procedures to this process which allows the Committee to hear testimony and review any presented documents from both the student and the University as to the charges made. The Committee then makes recommendations as to the findings and the sanction, if any, to be imposed.

Psy.D. Psychology Resident," and another that identified him as "Dr. Rick McCawley, Ph.D. Clinical Neuropsychologist" (a Ph.D. degree is different from a Psy.D.). All of these are titles that can only be used once a doctorate degree is actually conferred. In addition, the title of Clinical Neuropsychologist requires licensure. McCawley also routinely introduced himself as Dr. McCawley and otherwise so held himself out to the public.

The Psy.D. business card was printed by McCawley's employer following a misrepresentation to the employer that he had been conferred his degree. These actions resulted in the convening of a fourth QAC. In addition to the foregoing, evidence was presented to the QAC that in an engagement announcement that appeared in the Northwest Florida Daily' News in July, 2001, McCawley misrepresented himself as a Ph.D. in "clinical neuropsychology." McCawley's fiancee at the time, Ms. Laura Reeves, testified that McCawley represented to her that he was a doctor, that he obtained his degree from the University of Miami, and asked people to refer to him as Dr. McCawley. McCawley's explanation was that he was confused about whether or not he received his degree and whether he could hold himself out as a Ph.D. (despite the fact he was pursuing a Psy.D. and not a Ph.D.) after completing all of the academic requirements. The engagement announcement preceded his completion of his academic requirements by two years.

These misrepresentations violated the University's policies and procedures, the American Psychological Association's ethical standards, and Florida law. The University's Disciplinary Manual provides that "[s]tudents must not represent themselves as being in possession of a degree, either orally or in writing, directly or indirectly, until the degree has been conferred." The Manual also expressly provides that "[i]t is

inappropriate for the student to append 'M.S./Ph.D./Psy.D.' or 'M.S./Ph.D./Psy.D. Candidate' or some similar designation, after the student's name." It informs students that Florida law prohibits students from representing themselves as "psychologists" or "psychotherapists" until the corresponding professional license is awarded. Furthermore, Florida Statute § 490.012(1)(a) provides that "[n]o person shall hold herself or himself out by any professional title, name, or description incorporating the word 'psychologist' unless such a person holds a valid, active license as psychologist under this chapter." Similarly, § 490.012(1)(c) provides that "[n]o person shall hold herself or himself out by any title or description incorporating the words, or permutations of them, 'psychology,' 'psychologist,' or a 'psychodiagnostic,' or describe any test or report as psychological, unless such person holds a valid, active license under this chapter or is exempt from the provisions of this chapter." Finally, Florida Statute § 817.567 makes it a criminal offense to use the title "Dr." or "Ph.D." without having first been awarded a doctorate degree.

After the fourth QAC took evidence involving these misrepresentations, the University decided not to award McCawley a degree and dismissed him from the University. The dismissal was based not only on these last unethical acts, but on his entire prior record of past offenses for which he had been disciplined three times. McCawley chose not to attend the fourth QAC proceeding though he did attend and participate in the three prior QAC hearings. He also did not avail himself of any of the appeal proceedings relating to the fourth QAC. McCawley does not dispute any of the foregoing facts. He did not appeal the decision of the first QAC, admits he was treated fairly in the second and third QAC proceedings, but now dis-

putes the decision the University made after the fourth QAC proceeding.

### B. McCawley's Complaint

The Complaint is in two counts. Count I alleges a breach of contract in which McCawley alleges that he entered into an agreement with the University, that he met all of the criteria and requirements to receive his doctorate of psychology degree, the University breached the agreement, and its refusal to award him his degree was arbitrary and capricious. Count II is for specific performance in which McCawley seeks to require the University to award him his degree. The action was originally filed in state court and was timely removed to this court by the Defendant.

### C. McCawley's Contract with the University

As part of McCawley's application to the University's Doctoral Program, he signed a Graduate Student Agreement ("Agreement") which contains the following pertinent provisions:

\* \* \* \* \* \*

1. I agree that as a student I must follow the principles and guidelines instituted by the American Psychological Association (APA) regarding the psychological profession, which are specified in the following guidelines available in the Albizu Library:

 a) Ethical Principles of Psychologists

 b) Standards for Providers of Psychological Services

 c) Standards for Educational and Psychological Tests

 d) Ethical Principles in the Conduct of Research with Human Participants

2. In addition, I agree to abide by all MIP regulations contained in the Catalog, Student Handbook, Clinical Manual and Disciplinary Policies, as well as all MIP policies and procedures and their amendments.

3. I agree as a doctoral student to read and adhere to Chapter 490, Florida Statutes/I agree as a master level student to read and adhere to Chapter 491, Florida Statutes, as it pertains to the psychological profession and agree to observe and comply with the laws of the State of Florida as well as other applicable federal and local laws.

\* \* \* \* \* \*

7. I agree to fulfill all ethical administrative, academic, clinical, and financial obligations required by the Institute.

8. I am aware that I must maintain high standards in academic performance, and that any academic misconduct, including any acts of plagiarism, falsification of information, dishonest practices with examinations, copying of mother student's work or turning in of papers belonging to another student shall be subject to immediate dismissal.

\* \* \* \* \* \*

10. I am aware that any violation of the above mentioned norms or any violation of MIP academic and clinical policies and procedures may result in disciplinary action or dismissal.

In addition, the University's Catalog ("Catalog"), to which McCawley agreed to be bound in # 2 above, contains the following pertinent provision:

\* \* \* \* \* \*

*Institutional Dismissal* (See General Policies and Disciplinary Procedures Manual)

The Miami Campus reserves the right to dismiss at any time a student whose conduct has been proven to be in violation of institutional norms and procedures and/or acceptable standards of ethical and/or professional conduct, in

accordance with the applicable grievance procedure and/or fail to maintain the required academic standards.

Furthermore, both the University's Clinical Manual and Disciplinary Policies ("Manual") and the Catalog provide as follows:

> The completion of all academic and practice requirements does not guarantee conferment of the degree.

In sum, McCawley agreed to abide by the University's policies and procedures contained in the University's Catalog, Student Handbook ("Handbook"), and Manual. He also agreed to abide by all federal, state, and local laws as they pertain to the psychological professions, and agreed that any academic misconduct, including acts of plagiarism, falsification of information, and dishonest practices would result in immediate dismissal. Paragraph 10 of his Agreement expressly provides that violations of the University's procedures may subject him to disciplinary action or dismissal. The contracting documents also make clear that completion of academic requirements does not guarantee that a degree will be conferred, and that McCawley was subject to dismissal at any time if his conduct was proven to be in violation of the institutional norms and procedures and/or acceptable standards of ethical and/or professional conduct as required by the University.

## II. SUMMARY JUDGMENT STANDARD

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Maniccia v. Brown, 171 F.3d 1364, 1367 (11th Cir.1999). The movant bears the initial responsibility of informing the Court of the basis for its motion and of identifying those materials which demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In response to a properly supported motion for summary judgment, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts which show a genuine issue for trial." Fed.R.Civ.P. 56(e). If the non-moving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then the Court must enter summary judgment for the moving party. Celotex Corp., 477 U.S. at 323, 106 S.Ct. 2548. The Court, however, must view the evidence and factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. Maniccia, 171 F.3d at 1367.

"By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). The Court may not resolve factual issues, but may only determine whether factual issues exist. A material fact is one which "might affect the outcome of the suit under the governing law...." Id. at 248, 106 S.Ct. 2505. The Court's inquiry, therefore, is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250, 106 S.Ct. 2505.

## III. ANALYSIS

### A. McCawley's Conduct

There is no question that McCawley violated various norms of conduct in violation of his Agreement, and the incorporated University's Catalog, Manual, and Handbook. He does not dispute the violations, and in fact testified under oath that he violated these policies on numerous occasions. He also failed to contradict any of the Defendant's Concise Statement of Undisputed Material Facts, which set forth all his violations. His sole claim is that, irrespective of his numerous admitted ethical breaches, his dismissal after completing his academic requirements was arbitrary and capricious.

### B. The Arbitrary and Capricious Standard

▮ Courts are generally reluctant to interfere with or substitute their judgment regarding decisions of academic institutions to award degrees. Such decisions are afforded great deference and are generally not disturbed absent an abuse of discretion. Under Florida law, a university and its students have a contractual relationship, the terms of which are generally set forth in the university catalogs and manuals. *Jarzynka v. St. Thomas Univ. of Law*, 310 F.Supp.2d 1256, 1268–69 (S.D.Fla.2004). Such a contract comprises matters other than pure academic performance, such as rules of conduct, and students are thus contractually required to conform their conduct to the university's rules. *Id.* at 1269.

In *Sharick v. Southeastern Univ.*, 780 So.2d 136, 139 (3d DCA 2000), the court quoted with approval from *Bilut v. Northwestern Univ.*, 269 Ill.App.3d 125, 206 Ill. Dec. 531, 645 N.E.2d 536, 542 (1994), noting that "[t]he foundation of [the relationships between educational institutions, their students, and faculty] is the under-

standing that the students will abide by and adhere to the disciplinary regulations *and* the academic standards established by the faculty and the university...." (emphasis supplied). In *Jarzynka,* the court denied the defendant's motion to dismiss because the issue of whether the plaintiff violated a rule of conduct was a question of fact which could not be decided on such a motion. However, the court ultimately granted summary judgment in favor of the defendant, stating as follows:

> The Court begins by reaffirming its previous findings as to an implied contract between the Parties. Pursuant to Florida law, there is an implied contract between a student and a private university that if the student fully complies with the rules and regulations of the institution, then the university will confer to him a degree. *John B. Stetson University v. Hunt,* 88 Fla. 510, 102 So. 637, 640 (1924); *University of Miami v. Militana,* 184 So.2d 701, 704 (Fla. 3d DCA 1966); *Sharick v. Southeastern University,* 780 So.2d 136, 139 (Fla. 3d DCA 2000). That said, a private university has broad discretion in what rules and regulations it shall issue and how it enforces its rules. *Hunt,* 102 So. at 640; *Robinson v. University of Miami,* 100 So.2d 442, 444 (Fla. 3d DCA 1958).... The Court noted, however, that St. Thomas University could not exercise its power to remove a student arbitrarily. *Id.* at 15 (citing *Robinson,* 100 So.2d at 444).

> For purposes of the instant motion for summary judgment, the Court notes that a decision is "arbitrary," as defined in Black's Law Dictionary (7th ed.1999), if it is "founded on prejudice or preference rather than on reason or fact." *See also Militana,* 185 So.2d at 703 (defining "arbitrary" from Black's Law Dictionary (5th ed.1951) as "nonrational," "not done

according to reason or judgment," "without fair, solid and substantial cause"); [additional citations omitted].

*Jarzynka v. St. Thomas Univ. Sch. of Law,* Case No. 03–20652–Lenard–Klein (S.D.Fla. Aug. 23, 2005) (Judge Lenard's Order Granting Def.'s Mot. for Sum. J.) (D.E. No. 174) at 16–18.

Florida law is in accord with that of other jurisdictions. For example, in *Holert v. Univ. of Chicago,* 751 F.Supp. 1294 (N.D.Ill.1990), a graduate student was expelled for engaging in a systematic, prolonged and premeditated pattern of harassment of another student. He claimed his expulsion was arbitrary and capricious, and in bad faith. In rejecting his claim, the court concluded as follows:

2. Under Illinois law, a university and its students have a contractual relationship; the terms of their contract are generally set forth in the university's catalogs and manuals....

3. Holert had a contractual obligation to the University under the *Student Information Manual* not to harass or inflict personal abuse on another student.

4. Holert must establish that the disciplinary committee's determination that he engaged in a pattern of abusive and harassing conduct was made arbitrarily, capriciously and in bad faith, in order to prevail on his breach of contract claim against the University....

5. The disciplinary committee's decision is arbitrary and capricious only if it is without any discernable rational basis. Courts have adopted this deferential standard because of a reluctance to interfere with the academic affairs and regulation of student conduct in a private university....

6. A private university may prescribe the moral, ethical and academic standards that its students must observe, it is not the court's function to decide whether student misbehavior should be punished or to select the appropriate punishment for transgressions of an educational institution's ethical or academic standards....

7. The evidence produced at trial established that the disciplinary committee's determination that Holert engaged in a "systematic, prolonged and premeditated pattern of harassment" was rationally based on evidence and credibility determinations.

751 F.Supp. at 1300–01.

### C. *Application of the Law to McCawley's Claim*

 In this instance, McCawley relies, as he must, on his contract to pursue his claim. The contract thus necessarily includes all of the appropriate documents such as the Catalog, Manuals and Handbook which describe and delineate both academic *and* non-academic considerations which bind McCawley. The only way to defeat the actions of the University in not conferring a degree and dismissing McCawley from the program is to show that the actions of the University were arbitrary and capricious. As long as the actions of the University have a rational basis, founded on reason and fact, and are not shown to be the product of bias or prejudice, they cannot be considered to be arbitrary or capricious. Such decisions by a University generally are accorded great deference. *See Jarzynka,* 310 F.Supp.2d 1256; *Holert,* 751 F.Supp. at 1301.

 Here, although McCawley has incanted the mantra of arbitrary and capricious in his Complaint, he has shown no facts to advance such a proposition. In fact, he does not dispute any of the findings of each QAC, including the last one, and by so doing effectively concedes that each finding had a rational basis, and was

founded on reason and fact. He has not disputed a single material fact cited by the University in support of Defendant's Motion for Summary Judgment, and as a result all of those facts are deemed admitted pursuant to Local Rule 7.5 D. However, even without relying on the Local Rule, a careful examination by the Court of the entire record fails to disclose any facts suggesting that the actions of the University were based on anything other than rational judgment, reason and facts. As a result, none of the actions of the QAC may be considered to be arbitrary and capricious.

McCawley relies primarily on *Sharick, supra,* for the proposition that whether the University's actions were arbitrary and capricious is a question of fact for the jury to decide. However, that is not what *Sharick* holds. In *Sharick,* a set of unknown and undescribed facts apparently survived summary judgment, and a jury then determined that the actions of the University were arbitrary and capricious. This is a far cry from a holding that the question of whether a school acted arbitrarily and capriciously will always present a jury question. McCawley's reliance on *Sharick* is thus misplaced, and to survive summary judgment he must still show, which he has failed to do, that the action which the University took was based on something other than reason and fact. Based on the total dearth of evidence to support McCawley's claim, and his failure to dispute any of the findings of the various QACs, and particularly the last one, this Court finds that the Defendant has established as a matter of law that its actions were not arbitrary or capricious.

McCawley makes two other arguments which are equally unavailing. First, he claims that the cases applying the deferential standard to University decisions apply only to academic considerations. This po-

sition is plainly wrong, as demonstrated in the lengthy discussion above, and needs no further comment. Second, he claims that since the University certified that he successfully completed all academic requirements, he is entitled to his degree. He is also wrong on this point. Initially, it should be noted that the University issued the certifications at McCawley's request so that he could submit them to his employer at the time. Next, he also conceded in his deposition that the certifications in no way indicated that he had received his degree; and finally, McCawley's misrepresentations that led to his expulsion occurred after the certifications were issued.

Successful completion of all academic requirements does not guarantee conferment of a degree. McCawley's contract with the University required him to complete both his academic requirements *and* abide by all academic and disciplinary policies and procedures of the University. In fact, McCawley acknowledged in his contract that completion of his academic requirements *did not* guarantee conferment of a degree. His contract required him to also comply with the behavioral and ethical standards of the University. The University properly determined that McCawley failed to meet those standards. Thus, he can take no solace in having met one part of the University's requirements but not the other.

### D. Estoppel-type Argument

■ Despite McCawley's lack of evidence and his admissions, he makes an additional curious argument. He says that if he committed all of the bad acts found by the three prior QACs (which he admits), the University should have dismissed him earlier rather than wait until he committed his last undisputed transgression just before graduation. In effect, he argues that he acquired some sort of

immunity derived from the many second chances he received for his improper behavior which insulated him from discipline for later violations. This appears to be in the nature of some sort of estoppel-argument which was never pled and for which McCawley offers no factual support. Moreover, McCawley offers no legal support for such a proposition, and it appears that there is none. A university may base a dismissal of a student on a student's entire record even if earlier events did not lead to dismissal. *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 106 S.Ct. 507, 514–15, 88 L.Ed.2d 523 (1985). McCawley's premise seems to be that the University should overlook any late violations and confer a degree even though he necessarily admits that the finding and actions of the University on his last, and perhaps most serious, violation had a rational basis and therefore was not arbitrary and capricious. He has no one to blame but himself for his latest remission, and his argument that he should get a free pass for this conduct because the University led him to believe that this, too, would be excused is legally and logically untenable.

As the University correctly points out, such a policy advanced by McCawley would preclude a school from ever taking action against a student who had been given second chances, and would also prevent it from considering a student's entire record of discipline before taking action against such a student. Such a result could never obtain. McCawley's course of conduct ultimately caught up with him, he was dismissed for not only his last set of acts, but based on his overall record consisting of all his prior ethical breaches, and he cannot place the blame on the University for doing what it had an absolute right to do. Its actions were neither arbitrary nor capricious under prevailing law and his estoppel-type argument also fails.

B. *Specific Performance*

■ McCawley has made a claim for specific performance and asks that the University be compelled to confer on him a Ph.D. in psychology. The University argues—and the Court agrees—that Florida law prohibits such action. *See Sharick*, 780 So.2d at 139 n. 1 (the remedy of specific performance is "unavailable to compel the granting of a degree where an educational institution ha[s] exercised its discretion in refusing to confer such"). The only case cited by McCawley in support of specific performance. *Anthony James Dev., Inc. v. Balboa St. Beach Club, Inc.*, 875 So.2d 696 (Fla. 4th DCA 2004), concerned a real estate purchase contract, had nothing to do with an academic institution, and is entirely inapposite. McCawley's claim for specific performance fails as a matter of law.

## IV. CONCLUSION

It is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (D.E. No. 35) is **GRANTED**. Summary Judgment is hereby ENTERED in favor of Defendant Universidad Carlos Albizu and against. Plaintiff Patrick McCawley. Plaintiff SHALL take nothing by this action and Defendant SHALL go hence without delay.

All pending motions are DENIED AS MOOT, and this case is CLOSED.